Inc., Mr. Fornella. Good morning. Good morning, Your Honors. May it please the Court, I am Leonard Fornella, and I am here this morning representing the appellant, International Steel Services Inc., and I would like to reserve three minutes for rebuttal. As the Court understands from the briefs that have been submitted, this case arises under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, which is codified at 9 U.S.C. Section 201. And as the Court, I'm sure, is aware from reading the briefs, the case began because of two contracts that were entered into between ISSI and Steel Corp. with regard to an acid regeneration plant in the Philippines. Now Steel Corp. is a Philippines citizen domiciled in the Philippines, and ISSI, my client, is a Delaware Corporation domiciled in Pittsburgh. The first contract had to do with the construction of the acid regeneration plant, and the second contract had to do with the iron ore byproduct, the purchase and sale of the iron ore oxide byproduct of the plant. Two disputes subsequently arose in regard to the plant. The first dispute arose in regard to the construction of the plant. That dispute was arbitrated in the Philippines pursuant to the Construction Industry Arbitration Act in the Philippines, which resulted in a $150,000 plus interest award in favor of my client, ISSI. Subsequently – And what is the status of that award? Well, that award is done for the most part. That is finished, and later on in my argument we'll touch upon how that relates here. Essentially – That's what I'm getting to, but I don't want to reorder your argument. No, that's okay. Essentially that case is done. The second arbitration arose under the iron oxide supply agreement. That case was arbitrated in Singapore, and – And which countries' arbitration procedures do you contend were actually employed in that Singapore arbitration, 2004 arbitration? That's the rub, Your Honor. We contend, and we've always contended, that this case, these contracts were governed explicitly by the law of the Philippines because the contract has a provision in it that says that the – I'm sorry, I've diluted you a minute. It says that the validity, the performance, and the enforcement of the contract will be governed by Philippine law. And that's important. The validity, performance, and enforcement shall be governed by Philippine law. We have always taken the position that despite the fact that the situs of the arbitration was in the Philippines, the law that the parties specifically agreed that was to be applied in all respects, including procedural law, was the law of the Philippines. Despite the fact that it doesn't say the word procedural law, in fact, it says validity, performance, and enforcement of this contract shall be determined by the law of the Philippines. Couldn't – if you believe that to be error, could you not then have challenged in the Singapore courts that award on that basis? I don't – I believe there were some challenges in Singapore, but I don't know the outcome and how that happened, Your Honor, other than what's in the award itself. But I suppose that could have been challenged. But what ISSI did do after the Singapore award was issued, the final award was issued in November of 2004, was ISSI went to the Philippines and filed a petition asking that the Philippine award – the Singapore award be vacated because it did not comply with Philippine law. At that point in time, Steel Corp, again, a Philippine national company, argued that the Philippine court did not have jurisdiction. But interestingly, if you look in the appendix in the opinion of the court, the ISS – SCP did not argue at that time that the Philippine court did not have primary jurisdiction. All SCP, Steel Corp, argued in the Philippines was that all the rules for – all the rules yet were not in place in the Philippines for challenging arbitration awards, and they said that ISSI had to file an enforcement action before you could file an action to vacate. The Philippine court, the regional trial court in the Philippine court, rejected all those arguments of Steel Corp and issued an opinion that said we have jurisdiction to hear this petition that ISSI has filed to vacate this award that came from Singapore. At that point in time, Steel Corp had a time period within which to file a response to the petition. They didn't file a response in a timely fashion. ISSI moved for default, and the court issued a default. Now what's Steel Corp on January the 4th, 2006? Fifteen days later, fifteen days later on January the 16th or 19th, 2006, Steel Corp files an action here in York County, Pennsylvania, seeking to enforce the Singapore arbitration award, which had just – they had just been defaulted on fifteen days earlier in the Philippines. That case was eventually removed from York County court. The federal court transferred to the court here in the Western District of Pennsylvania, and that's how we ended up here before the court eventually. Now our position is, as you made clear in the brief, is that when SCP was defaulted in the Philippines, that constituted a setting aside or a suspension of that arbitration award that had been issued in Singapore. How else can you define a default other than the fact that it means that you, Steel Corp, don't have the ability anymore to enforce this award because I've defaulted you with respect to the response you were required to file in relation to the petition to vacate that has been filed. So rather than having to face – Now let me make sure I understand. You're saying that the crux of your case, as I understand it, is that Philippine law was to be applied. Philippine law was to be applied. That's why you went into the Philippines to stay the award that was handed out in Singapore. Isn't this a bit unusual to believe that the Singapore Tribunal was going to apply Philippine law, both substantive and procedural? Well, no, because the contract specifically said that that was to be the case. And in fact, the parties agreed to that. It was specifically in the contract. In fact, when I took the depositions of the chairman and CEO of SCP, he admitted that he understood that Philippine law was to be applied and he never understood any intent to apply Singapore law. I also took the deposition of the expert that they presented, that SCP presented in the Singapore arbitration hearing in regard to the law to be applied. And he said he understood that Philippine law was to be applied and that he had – there was no difference between Philippine substantive or procedural law. His estimation was all the same. You frequently cite the Fifth Circuit's case in Karaha. How do you cite that throughout your brief? Well, that's because the decisions of the district court below, the decision against our position on the motion for judgment on the pleadings and then the follow-up summary judgment was based upon the fact that the Karaha case precluded the court from – or required the court to enforce the award. Karaha is completely different. Yeah, I mean, you cite it – you argue it actually supports your position. Do you not? No, not really. We're saying it's distinguishable for a number of reasons. The adverse party there, Petermina, was the party who was on the other side of the court on that case. Petermina first appealed this – that decision in Karaha to a court in Switzerland. Now, that contract between Karaha and Petermina did not have a specific clause in it that said Swiss law was to apply. It simply said that the place of the arbitration was to be in Geneva. Nevertheless, Petermina goes to Switzerland to try to get that award vacated and says Swiss law applies and Swiss procedural law applies. But doesn't – didn't the Karaha decision say that it's undisputed that the party specified that Indonesian substantive law would apply? Because – yes, Petermina took that position throughout prior cases. They took that position in Switzerland. They took that position initially with a district court in Texas. When they lost initially in Switzerland, then they went to Indonesia and the first time – and that's the first time they switched their positions and said, oh, no, Swiss law is not primary. Indonesian law is primary. We've never done that. We've always said Philippine law here is primary. Philippine law was agreed to by the parties. It's been primary from the very beginning. The other thing about Karaha is that the court in that case was significantly affected by the fact that Petermina was switching its positions like that. In fact, they applied a judicial estoppel to Petermina's positions and said you can't say on the one hand in the Swiss court affirmatively that Swiss law applies and Swiss procedure applies and then come back when you lose and go to another court and say, oh, no, Indonesian law is primary. Again, we've never taken that position at all. We've always taken the position that the contract itself. The fact that the arbitration took place in Singapore doesn't mean that Singapore procedure law is to apply. There's no presumption in that regard. And the rules, the international arbitration rules under which this arbitration was supposed to take place specifically indicate that there is no such presumption. The other interesting thing is that the Singaporean arbitrator never discusses which law he's applying. Philippine law, it doesn't say he's applying Singapore law. And that's part of the reason that the petition to vacate that award was filed in the Philippines was because the belief was he didn't apply Philippine law, didn't refer to it, didn't understand it. I see my light is turning yellow, so I'll move on to the next argument unless the court has some questions at this point. The next argument we raise, Your Honors, is that when the court ruled against us on our summary judgment motion and entered summary judgment in favor of Steel Corp, thereby enforcing the arbitration award, we filed a subsequent motion under Rule 60 of the Federal Rules of Civil Procedure asking that we get relief from that order to some degree because that the judgment that she entered had been partially satisfied relief or discharged by virtue of other activities that were happening in the Philippines. And that raises the issue that Judge Smith asked about earlier on and what happened to the first case. The first case in which my client, ISSI, was the beneficiary of a $150,000 award against SCP in the Philippines was not paid. My client then went to court, the regional trial court and sought an execution. When we went to get the execution, Steel Corp opposed the execution and said you shouldn't yet be able to execute against this award because we already have the Singaporean award that's of a higher value and therefore they should be offset. The court in the Philippines accepted that argument and they call it a extinguishment by compensation, essentially offset our $150,000 plus interest award against the higher Singapore award. We asked the court here to honor that and to do the same thing with respect to the judgment that was entered here on the basis that if that didn't happen we'd have conflicting judgments. We would in essence have a judgment in the United States against ISSI of $648,000 in its entirety against which we could not go back in the Philippines to offset it because that $150,000 award has been extinguished by the court in the Philippines. So we're subject to double payment and conflicting awards. The Taylor case that the court cited in support of her decision not to grant our motion for the offset is clearly distinguishable. That case was a- Well, you're past your time at that, Mr. Piniella. You have reserved time. We'll let you speak to that in a moment if you wish to. Thank you. Commissioner? Good morning, Your Honor. May it please the court. Paul Minnick on behalf of the Apele Steel Corporation of the Philippines. If I can focus my argument on what I believe to be the two principal issues raised by appellants in the proceedings. The first is that a contention at the Singapore Arbitration Award has not yet become binding on the parties or has not been set aside or suspended by a competent authority of the country which or under the award was made. The second argument they make is a public policy argument that somehow some type of forum shopping occurred here. We believe Judge Ambrose did decide the case correctly in the three related decisions that she wrote. She noted as the papers reflect the New York Convention is pro-enforcement of foreign arbitration awards. It has a pro-enforcement bias and the defenses to enforcement are very strictly limited. And the party opposing enforcement has a burden of proving the existence of one of those defenses. The first defense that they cite under the Convention Article 5.1.E is that the award is not yet binding on the parties or has been set aside or suspended by another court. Here we have the underlying contract that says once the award is rendered it is binding and effective on both parties. So we think the contractual arrangement of the parties at the outset establishes that arbitration and the award is in fact binding. The other requirement they can meet is if they can show that the award has been set aside or suspended by the court under the laws of which the award was made. And in this case we are one week away from five years from when this arbitration award was entered and there is still no order from any court anywhere setting aside or suspending the validly entered Singapore arbitration award. Our other argument in that vein is that this was a Singapore arbitration. It was conducted in Singapore. It was Philippine substantive law but Singapore procedural law. And we would refer the court on the issue of Singapore procedural law. The appendix at page A67. This is paragraph 7.1 of the arbitrator's own award which we believe is dispositive. And he says the applicable law of the arbitration proceedings is the Singapore International Arbitration Act. So we think it is clear that this case was decided under Singapore procedural law and that therefore the Singapore courts are the only courts who could void, set aside or nullify the arbitration award. But instead of filing in Singapore, ISSI filed in the Philippines. When the case was first in front of Judge Ambrose when she denied ISSI's motion for judgment on the pleadings, she concluded what she found and this is back in 06. She said they are challenging the Singapore arbitration in the wrong place. It needs to be challenged in Singapore. So what they are doing in the Philippines doesn't matter and won't nullify this award. And what was significant is that in subsequent case developments approximately two years later when there were proceedings in the Philippines about the arbitration award, the Philippines Court of Appeals, their intermediate appellate court concluded that the Singapore award rendered under Singapore procedural law could only be challenged in Singapore. They were talking about these very parties and this very award. And they specifically said as we cite, the Philippine courts have to accord respect and recognition to the foreign award because an action to set aside an award can be brought only under the domestic law or the arbitral forum, i.e. Singapore. Our local courts under both local and international law do not have jurisdiction to set aside a foreign arbitral award. So the appellate courts have already spoken and issues been raised that their regional trial court proceedings that ISSI has pending and have been pending for years in the Philippine courts. They claim that we were defaulted as Judge Ambrose noted looking at the papers and as the papers themselves reflect, there was an initial default taken because there was a service problem. Our client never got the papers. So they filed a motion for emergency relief. That was granted. That case is still pending in the regional trial court. We haven't been defaulted. The case was sent to mediation and it's waiting to go to trial. So there's no default. There's no setting aside that's occurred in the Philippines. And while that case is still technically pending, we have a situation where we already have the benefit of knowing that the Philippine Intermediate Appellate Court has already decided that this very arbitration award at issue is valid and cannot be challenged under Philippine law. And they have not challenged in Singapore. So they do not have any existing set aside nullification or voiding. So it's certainly appropriate for Judge Ambrose after again an almost five year wait to conclude that enforcement was appropriate particularly given the pro-enforcement. Using that same decision from the Philippine Intermediate Appellate Court, why shouldn't there be $150,000 set off? I think there should be. In this case? In this case. We initially, I believe Judge Ambrose correctly decided the Rule 60 issue and to be perfectly candid as I went through the papers, while I agree with her analysis on that point and I think under Rule 60 and under the Taylor case that she got that right, I think when we come before court, we shouldn't be making inconsistent arguments so that what was good for us in the Philippines ought to be good for them over here. So we are willing to stipulate the Rule 60 issue and that acknowledge that when our award is conformed and enforceable that ISSI is entitled to its offset. So we by stipulation will agree to render that issue moot. I don't think, and I want to make it clear, I don't think Judge Ambrose got that issue wrong. I think under Taylor and under 60B she got it right. But we also think looking at the totality of the circumstances, the Philippine court interpreted it under their law somewhat differently, but there ought to be symmetry to the proceedings. And essentially our position is that two valid arbitrations occurred, one in the Philippines and one in Singapore. We won one, we lost one. We accept we lost one, they ought to be entitled to an offset. All we're saying is after five years, after they didn't file in Singapore, after there's no court anywhere in the world who has set aside or nullified our award, that we're entitled to get enforcement. And we've cited to the court, you know, various cases that support that including the Karaha Bodas matter. So I'll jump to the second issue which is it raises this moral exception, this public policy exception. And as our papers reflect this public policy exception is very narrowly construed. We have to really get into issues of fundamental justice and morality. And they say we're forum shopping. And the reality is we came to this country, the Steel Corporation of the Philippines came to this country because this is the only place ISSI has assets. So that's why this forum was selected for enforcement. And that's the whole purpose of the convention, understanding that you may need to take a foreign award to the country of its, where the party against whom enforcement is sought actually has assets. But there's nowhere that this even comes close to a public policy violation so fundamental, so contrary to morality that this shouldn't be enforced. We also think the convention also does make clear that there is a discretionary element that the courts have. The convention does reference the fact that in situations the court may refuse enforcement, but it doesn't have to. And again, under the totality of circumstances we believe the district court, seeing and understanding all the undisputed facts of record, reached an appropriate conclusion. Unless the panel has any specific questions of me, I'm prepared to conclude. Thank you very much. Thank you. Thank you, Your Honors. Just a few quick points. First of all, I thank Mr. Minnick for offering the stipulation. I just want to note that when we filed our motion under Rule 60 in the district court, it was for more than $150,000. It was for the award plus the interest that it accrued. At that point in time, the total was $247,500. So with that understanding, I will move forward. Other than to say that we continue to disagree, apart from the stipulation with Judge Ambrose's decision that the Taylor case controls, because the Taylor case had a completely different scenario. It had involved an offer of judgment under Rule 68 that was accepted to be a part of a contract, a payment to a third party that was not included in the offer of judgment. We don't have that case here. We simply have two arbitration awards between the same parties that are offsetting each other, and the same should be in place here as it is in the Philippines. I want to address briefly a couple of arguments that were raised by Mr. Minnick. The first is with respect to the Singapore arbitrator. He makes a statement in his arbitration award that the applicable law of the arbitration proceedings is the Singapore International Arbitration Act. But he then says the proceedings before the arbitrator are governed by the International Court of Arbitration rules of arbitration, and where these rules are silent by the Singapore International Arbitration Rules. So in neither case does he specifically apply either the Singapore Rules of Procedure or the International Court Rules of Procedure. And our position is, as indicated under our brief, that there is no presumption under the international rules that the procedural laws of the forum are to apply. Moreover, the Karaha case makes clear in those lines of cases that it is the intent of the party. What was the contractual intent of the party as to what law was to apply the controls, no matter what the arbitrator says or thinks. In this case, clearly the parties agreed in their contract that it was the law of the Philippines that was going to control this contract in all respects, including the enforcement. Now in regard to forum shopping, we continue to maintain that they were forum shopping by coming to the United States. That case in which they were defaulted is still pending in the Philippines. And while Mr. Minich says that there is no default, that default has never been lifted. What happened was the court defaulted them, then stayed the case for mediation. After the mediation was unsuccessful, it issued a pretrial order. The case is still pending. It hasn't been decided. The default has never been lifted. It's still in effect. So when Steel Corp came to this country on January the 19th, 2006, and asked the court to enforce an arbitration award, they were asking the court to enforce an award that had been suspended by virtue of the default. It didn't exist anymore. You can't ask the court to enforce something that another court has already said is suspended. But on that point, Article VI of the New York Convention, you had chosen Singapore procedural law and only a court in the forum country can annul award or make such a ruling. Is that not correct? Our position, Your Honor, is we did not choose Singapore law. The contract between the parties said that the law of the Philippines was going to apply in all respects, including enforcement. And that's been our position from the very beginning. It was the law of the Philippines that applied. Therefore, the Philippine courts were the courts of primary jurisdiction, and those were the courts in which enforcement or annulment of the award could take place initially. What then do we do with the language that you had chosen the Philippine forum? I'm sorry? What do we do with the language in your contract that you had chosen the Singapore forum? It's only the forum for the location of the arbitration. That has nothing to do with which country's law applies. The first sentence in that provision says that the laws of the Philippines applies. It only indicates that the arbitration will take place in Singapore. Thank you. Thank you. Thank you, Your Honor. On the matter of the stipulation, if one can be reached, it seems to me that the parties should indicate to the panel a brief period of time during which you might work to enter into such a stipulation and then notify the court of that fact that it provided such a reasonable and relatively short period of time to accomplish that. You've made the offer, Mr. Menekis. If five days would be acceptable. Certainly. Is that satisfactory, Mr. Cornell? Yes. All right. We will then await word from the parties in that regard, and we thank you for your willingness to discuss that. We thank you for your argument. Otherwise, I'm revised.